May it please the Court, Joe Sequenza for Petitioner. The issue presented today is whether substantial evidence supports the adverse credibility finding of the IJ when the finding is based primarily on demeanor and the sufficiency of corroborating evidence. Counsel, help me a little on this. Some of what the IJ and the BIA said sounded like it wasn't as careful as it might have been, like Rajinder and Ravinder, that sort of thing. But when I read the excerpts of testimony by the asylum seeker, Arora, I had the same response to the written record that the IJ appears to have. which you could argue either way on that, that the doctor may have had a sprain or didn't write it down because a sprain is not that big a deal. But he didn't really try to answer. He said, well, ask the doctor. Well, good luck asking the doctor. He's in another country, and it's hard to even ask the doctor when he's in this country. Hard to get him on the phone. And then when he's asked about some records that aren't there, about a protest he's supposed to have put in, been in, and he says, well, maybe some reporter put it in the newspaper. Like, oh, yeah, sure, I'll get the newspapers from that remote part of India, and I'll read all the papers and see if you're right. It looks like he's just trying to blow the IJ off with dismissive, truculent responses. Why isn't that enough for the more than a scintilla but less than a preponderance standard that the administrative agency has to meet? If I might address those concerns point by point. Your concern about when Petitioner was questioned about why something was not included in the doctor's report, and I believe his response was, ask the doctor. Petitioner would submit that that's not necessarily a belligerent answer. Not necessarily, no. It's just a question of whether an IJ could interpret it that way, because the burden is on the asylum seeker, and all they need is substantial evidence on the record as a whole. It doesn't matter that there's an alternative explanation that might be good. Well, perhaps, Your Honor, what Petitioner was trying to get across, inartfully, admittedly, was that he didn't know, and he didn't know. He didn't say that. I can't ask my doctor. I can't get the doctor on the phone. I'm going to call a doctor in India? I mean, maybe what he means is I don't know, but he didn't say that. Well, addressing these documents as a whole, especially the affidavits, I believe the IJ's one of the IJ's concerns was that these affidavits were lacking in minute specificity about how the Petitioner was mistreated during his various arrests. No one bothered to ask the Petitioner how these affidavits were obtained, how each of them were obtained, and whether Petitioner was directly involved in obtaining these affidavits. So additionally, these affidavits seem to be sufficient in that they've addressed, the majority of them have addressed each arrest. The dates were correct. And they reference, and most of the affiants, rather, characterize Petitioner's mistreatment at the hands of the police as being subjected to torture, severely beaten, inhumanely treated, and I believe it's the precedent of this circuit that these corroborating affidavits or corroborating evidence, if in fact they're needed, do not necessarily need to be, quote, strong or conclusive as to the claimed injury that was suffered by the Petitioner. Getting back to your concerns, Your Honor, about his responses, certainly you could correct, characterize his initial responses to some questions as evasive and nonresponsive, but at some point he does admit and he does directly answer the questions posed by the IJ or by government counsel. Because the affidavits or the corroborating evidence lack minute specificity as to the details of harm to the Petitioner, that should not be held against Petitioner, especially when he wasn't confronted or questioned as to why such affidavits were so lacking or how he obtained those affidavits. Was it through his dad? Was it through a family member? Was he directly involved? And whether or not, well, as to whether or not they were obtained solely by efforts of the Petitioner or by someone on his behalf? The IJ also had concerns about lack of arrest reports, and the IJ seemed to improperly assume that the arrest reports existed. I think that's where it came up that it was pretty clear the IJ didn't believe this fella, and he says, check the newspapers from, I don't know, whatever the town was in India. Well, my belief, if I remember the record correctly, the IJ had asked the Petitioner where the arrest reports or where are any newspaper articles, assuming that they were, that the arrest reports existed. The initial response by Petitioner was evasive, nonresponsive, but, again, he did, after some questioning, basically said he didn't believe that the reports existed because he fled to save his life. He didn't go back to bother about getting reports, that he believed that the arrests were illegal in the first instance and that, in his mind, reports didn't exist. So I think that the IJ faulted Petitioner unfairly by assuming that the arrest reports were, in fact, in existence, and Petitioner failed to obtain them. What about, it's, this answer bothered me. Maybe, well, sir, the letter you have in front of you, I was in detention for three days. It was not three days. It was five days. Maybe I was in detention for five days. The muscles were torn on the first day. And maybe doctor didn't thought it's important. I can certainly read that sympathetically and think three days, five days, what matters here is detention. And torn muscles, bad bruises, what matters is injury while detained. But I can also read it unsympathetically, that he's not inclined to give a straight answer on how long he was detained or what happened to him when he was there. Again, Your Honor, I concede that his initial responses could be characterized as evasive or nonresponsive. I don't want to use the word truculent. But at some point, perhaps. To me, it struck me as kind of pouty. You're challenging me? That kind of sound. It could be interpreted in that sense, Your Honor. But I would submit that overall, with a review of the record and the way that Petitioner answered, perhaps it's a lack of sophistication, if anything, in being in a courtroom and being able to answer questions directly. Was he testifying through the assistance of an interpreter? He was. And it could also, as Your Honor pointed out, it could be an interpreter factoring in the interpretation of the testimony. Many transcripts that come before this Court, I would submit, have that factor, that perhaps the testimony was not as crystal clear as it could be because of the use of an interpreter. If I could just briefly refer to the demeanor aspect of the I.J.'s ruling, decision, rather. It's interesting to note that even though the I.J. characterized Petitioner's testimony as evasive and nonresponsive, he also referenced that Petitioner appeared, quote, clearly rattled and was defensive and hostile. But he didn't specify in the record what questions he was referring to. It's also interesting to note that the I.J. had noted that Petitioner's testimony was also consistent with what was related to the asylum officer. Petitioner's testimony in this case was consistent and plausible with his, not only what he said to the asylum officer when he was interviewed, but also with his declaration and consistent with the affidavits. Do you want to save a little bit of time for rebuttal? Yes, I do. Thank you. Margaret O'Donnell for the United States. The Court should deny the petition for review. In his opening briefs to this Court, Petitioner fails to identify any record evidence compelling a finding that he testified credibly. Some of this stuff looked pretty trivial. Like the I.J. is disturbed that he doesn't mention the times that the police stopped him, took his identification and said, don't come back here demonstrating again, or something along those lines. And that struck me as something so much less substantial than when he actually gets, at least as he alleges, put in jail and beaten up, that it seemed perfectly plausible to me that an honest man wouldn't mention it, just basically the police giving you a warning and not arresting you. If we were to parse each Kind of like if you asked somebody about their traffic violations, they probably wouldn't even remember or relate the times when a policeman said, nah, you really ought to drive a little slower, but I'm not going to give you a ticket. If we took each one of these individually, we could find, I'm sure, as you said, looking at my traffic record, I could find things I probably should have admitted to. But this adverse credibility finding is based on three very strong pillars. The first being demeanor, which is entitled to special deference because the immigration judge is the one who witnesses his demeanor in court. The second is omissions from the record or from his application that came up in testimony that the I.J. Well, let's talk about that. It seems to me in reviewing this record that a lot of the I.J.'s adverse credibility findings surround the notion that the declarations submitted do not corroborate the petitioner's claim and his testimony. And I find it hard to credit that on this record. Even with the deferential review that we have to accord to the I.J.'s finding, he was there and witnessed the petitioner's demeanor, because as I go through these declarations, there are, I think, numerous corroborating statements in very important respects. And it just seems like the I.J. really discounted that. You know, when you have the number of declarations submitted that this petitioner had, I wouldn't expect that the statements to really mirror each other. If they do, there's something perhaps a bit suspicious about that. And so obviously the declarations focus on different things, but it is replete with various statements that he was targeted because of this activity, he was rounded up, he was tortured. And so with regard to all of the conclusions based on the lack of corroborating evidence from these declarations, how do you reconcile the I.J.'s findings with the record? If you will look at two of the declarations that are in there, and this was one of the points that the Board, in agreeing with the I.J., and forgive my pronunciations, that they did not have the level of corroboration that was to be expected after supposedly Aurora went and lived with Harvinder for four months prior to departing for the United States, immediately after one of his detentions with the injuries. The declaration makes no mention of him living with him, makes no mention of him being injured at that time. The other one, Parminjitz, he specifies to the May 1999 arrest, and contrary to petitioner's testimony, he says that he was abused and mistreated at that time, whereas Aurora in testimony says he was not at that time. And so that's where I think that, yes, the ones from his father, from Baldev, and from himself are consistent, and the various other ones can be consistent with much of his testimony, but those are striking in there. Let's see. You've got two declarations. One says he was injured when he says he wasn't, and the other one says he wasn't injured when he says he was? Yes. Can you circle back? You said there were three pillars. One was demeanor. What are the other two? Omissions in the asylum application. The asylum application doesn't contain any information about him being fingerprinted and photographed after each arrest. His response to the court, this also goes to demeanor, his response to the court when they asked about it, when the IG asked about it, was I gave that answer to the Honorable Court. Is that the one where the court basically said his declaration omits one entire arrest? I can't answer that, Your Honor. Well, as a basis for an adverse credibility finding, the IG determined that the petitioner failed to include all four arrests that he testified to because it omits one entire arrest. Yes. That was one of the findings, but that wasn't one of the omissions that I think he was pointing out. The petitioner says that he was photographed and fingerprinted after each arrest, and the immigration judge says, Is that in your application? And he says no. In fact, and that also goes to the warnings, that was the next one, was the warnings that the Punjabi police allegedly gave him after each arrest. The IG asked him seven times if this was in his application. And the third arrest, petitioner's third arrest in detention, the fact that it lasted for five days, and why this was not in his application, his response was, I didn't think it was important. I do want to, oh, well, let me finish with the circling back. The last pillar is that the testimony is inconsistent with documentary evidence other than the declarations. Okay. Give me the inconsistency. Oh, I'm sorry. Yeah, it's a little hard to hear in here. Are you talking about not just the doctor's note? No, no. I'm talking about, well, the medical evidence and the lack of any documentation on arrests. And I want to speak to something my colleague just mentioned. He responded three times when asked about that arrest, the documentation of arrests. The first time he responded to the IG that he was too afraid to go back to India to get the documentation. The second time he says the arrests were illegal so there are no documents. On the third time he says, I didn't try. Do we expect petitioners to produce corroborating documents like arrest reports when they're not easily obtained? Well, they can certainly explain that they're not easily obtained. We don't know that. He didn't try. That was his response. So your argument is there's no evidence that they would be difficult to attain There is no evidence that they'd be difficult to obtain. Some of what put me off here, I don't know whether to credit the translator. What language was he speaking? I do not know, Your Honor. But I have to raise this issue on the translation. This was not raised before the IG. There was no issue identified to the IG about translation. Oh, I know that. And it wasn't raised before the board. Well, actually, it came in front of the IG in kind of a backwards way. Evidently, this fellow speaks English. And the IG told him, quit speaking English. Talk to the interpreter and the interpreter will interpret. That happens quite often. It struck me that when he was asked, is Mr. Siegel, I think that was the lawyer for the agency, was it? It must have been, yes. He asked, did you submit to the court any arrest records or other documentation, such as a newspaper article, about your arrest? And he says, no. And the lawyer asked him why not. And he says, probably I couldn't find that. And I thought, probably? Are you saying, well, I'm trying to come up with an excuse and that might be a good one? Or are you saying I looked and I couldn't find it? Well, he's saying probably. So I was wondering how much weight to put on probably because if everybody spoke English, I would think this guy is just playing with me. There's a point in time that the IJ is so frustrated that he actually says to him, I am putting you on notice. He might not use that strong a language, but he says, I think you're hiding something. And I think that speaks volumes as to what he's witnessing in the courtroom. We weren't there. We don't know. But that says a lot. His level of frustration at trying to get the information out of this fellow. Petitioner. I guess I'm still waiting to hear the inconsistencies. The inconsistencies with the declarations. They were. Of any sort. I mean, what's inconsistent about his testimony? Just tell me he said this and it's inconsistent with that. Well, we can go back to the declarations. He testifies that he wasn't injured after the May 1999 arrest. The declaration from Parminjik says that he was abused at that time. He says that he, after his final arrest, he went and lived with Harvinder. And Harvinder doesn't mention that. And he doesn't mention any beating or injury to him at all. But it's also, in much of his testimony, inconsistent with the documents in the record as to country conditions. From Amnesty International through the 2008 Department of State country report says all of this ended in 1995. He joins in 1999 this group, this Sikh militant group. Actually, it's a legal group. He testifies that he is responsible for transportation and food at meetings. He is not a high-level individual. Yet everything in the record says that the only people being targeted at this late date, following the cessation of hostilities in 1995, are people who are high-level militant bordering on terrorist individuals. The documents also reflect that he can relocate anywhere in India. He is not limited to the Punjab. And that there are Sikh communities throughout India. And also it reflects that the Sikh population has attained high office, if not currently the president. He was, a Sikh was president of India in 2008. Actually, almost a minute and a half over time. Oh, I'm sorry. All right. Thank you, Your Honors. Thank you. If I might briefly address a couple of concerns raised with counsel's argument. I believe that the language spoken, Your Honor, was Punjabi. And there was discussion here today about the lack of additional details in the 589 application that were testified to at the individual hearing. I think what is significant to note is that the IJ himself said that that was not a significant concern to him because whatever he testified to at the merits hearing was consistent with what he testified to in front of the asylum officer. So that was not necessarily a significant concern for the IJ. The IJ faulted Petitioner because presumably he had not included his first arrest in 1999 in the declaration. And that is belied by the record. I believe that Petitioner's declaration does address the 99 arrest. There's an affidavit at AR 569 from an individual who housed Petitioner after he fled his home and prior to coming to the United States. The IJ faulted Petitioner's or that affidavit because it didn't specify the reason why Petitioner was staying with this particular individual. However, the record does not have any evidence as to whether or not this individual was privy to knowledge about Petitioner's experiences. So I believe that the IJ unfairly faulted Petitioner for, quote, that lack of specificity in that particular affidavit. All right. Thank you, Your Honor. Thomas Wells, unless my colleagues have any remaining questions. Thank you. We thank you very much for your arguments in this matter submitted for decision by this Court. Thank you, Your Honor.
judges: KLEINFELD, NGUYEN, WATFORD